Howry, J.,
delivered the opinion of the court:
Plaintiffs are contractors residing and doing business in Chicago, but carrying on extensive contracting work throughout the country.
For the consideration of $440,000 they, on March 10, 1900, entered into a contract in writing with the United States for continuing the improvement of the Warrior Eiver, in the State of Alabama, for the purpose of securing a navigable, depth of 6 feet of water from Mobile to Birmingham. The improvements called for by this contract were in addition to $220,000 theretofore appropriated and expended for the same purpose.
Advertisements for sealed proposals 'for building Locks and Dams Nos. 4, 5, and 6 on this river were published stating the requirements of the Government in the specifications. Plaintiffs made a proposal in writing on the specifications which described that the dam should be built of timber cribwork, tightly sheathed, and filled with gravel or stone, and to rest on pile foundations. The work was to conform generally to drawings exhibited and to such others in explanation of details or showing modifications of plans as might be furnished from time to time during construction. (Par. 40, Spec.)
The specifications provided that maps of the localities might be seen at the office of the United States engineer at Tuscaloosa, Ala., until January 20, 1900. Bidders were notified that they were expected to visit the premises and to make their own estimates of the facilities and difficulties attending the execution of the work, including the uncertainty of weather and other contingencies. (Par. 3, Spec.)
By paragraph 38 it was provided that the quantities of material called for and necessary for the work were approximate only, and that no claim should be made against the United States on account of any excess or deficiency, absolute or relative. Bidders were told that they were expected to examine the drawings and invited to make the estimates *322 of quantities for themselves, though they were informed .that it was not expected that the actual quantities would vary more than 10 per cent from the estimates.
The work was to begin 30 days from date of notification of 'approval of the contract and completed not later than December 31, 1901.
Two members of the contracting firm visited Tuscaloosa to secure information upon which to prepare their bid. They drove to the site of one of the locks and dams and, being satisfied, declined to visit the site of the other two locks and returned to Tuscaloosa, which was on the river. and not greatly distant from the site of the. locks.
The contract provided that—
“The engineer officer shall have the power to prescribe the order and manner of executing the work in all its parts; of inspecting and rejecting materials, work, and workmanship which in his judgment do not conform to the drawings that may be furnished from time to time, or to these specifications. Any material, work, or workmanship so rejected by him shall be kept out of or removed from the finished work, and no estimate or payment shall be made until such material, work, or workmanship be so removed. * * * In all cases of dispute the decision of the engineer officer in charge will be accepted as final and without appeal.” (Par. 18.)
The right was reserved to make minor changes in the specifications and letting plans, but no modifications were to- be made the basis of claims for extras unless so provided by written supplementary agreement.
The specifications were stated to be intended to be “ full, clear, and complete ”; any doubt as to their meaning or obscurity in the wording was to be explained by the engineer officer, who reserved the right to correct any errors or omissions as such became apparent.
. Plaintiff encountered difficulties. Warrior River is an alluvial stream, and its fluctuations between low water in summer and high water in winter and early spring ranges from less than 1 foot to more than 70 feet. In flood stages the river overflows its banks and spreads out over the adjacent. country from 2 to 5 miles. On account of freshets, floods, and epidemics of fever and malaria during the work *323 ing season of the year that the contract was let, and the scarcity and difficulty of procuring labor during the second, third, and fourth years of the contract, the time for the completion of the work was extended on application of the contractors on March 18, 1901, to December 31, 1902, without the deductions provided for by the specifications.
Again, on March 12,1902, there was a further extension of time upon written application from the contractors to December 31, 1903. The causes were embodied in a supplemental contract dated April 29, 1902, and the prescribed deductions for expected failure to complete were remitted.
Locks and Dams Nos. 5 and 6 were completed by plaintiffs and accepted by the United States in December, 1902, and Lock and Dam No. 4 was completed and accepted in like manner in November, 1903. Embraced in the settlement for all work done by the contractors were sums amounting to $469,144.37, which included extras, in addition to the contract price originally named.
But plaintiffs allege that there were other causes which made an extension of the time for the completion of the contract necessary, such as delay in notifying the contractors that stone would be required in place of sand and gravel; changes in the quantities of stone required; increased quantity of excavation at one of the locks under the supplemental contract; and delay in securing title to the land where an abutment was to be erected at one of the locks. The breaches alleged to have arisen may be summarized, viz: (1) From delays and causes just stated; (2) from untrue and misleading statements of fact contained in the specifications charged to have been known by certain subordinate officers; (3) from unauthorized changes in the plans and specifications; and (4) from the appointment of incompetent inspectors whose supervision of the work was alleged to have been unintelligent and unreasonable.
The record is voluminous with pleading, testimony and exhibit, statement and argument. Supplemental to three large volumes of printed matter there are photographs and maps, account books and tables relating to excavations and embankments, and much matter in manuscript. The court *324 discovers important testimony not in the printed record and does not understand why, under the order to print, any testimony of importance should have been omitted from the printed volumes. But after careful investigation the court has made the findings which must determine whether they support the conclusions.
The second finding disposes of the contentions respecting delays in permitting commencement of the work. By the finding it is shown that between the conditions caused by floods in the river and the delays caused by the Government the delay did not rest wholly upon one side to the controversy. Thus, when one of the contractors arrived to begin the work the river was in such a state of flood that the gauge registered 37 feet above low water at Tuscaloosa; on April 10 the water had fallen 10 feet, but rose again in 9 days to a height of 66 feet, gradually receding until 21 feet was registered the 1st of May. On April 24, 1900, the river was at a 40-foot stage, and, though the contractors wanted the stakes set for clearing and excavating the sites of the locks and abutments, it is manifest that the Government could not immediately comply.
But there was a defect in the title to the tract on which one of the locks was located. Plaintiffs were not permitted to begin work there until June 14, 1900, at which time the stakes for clearing were set and stakes for excavation were so fixed as to permit excavation work to begin August 14, 1900. But after the subsidence of the waters on May 10, 1900, to 7 feet, another flood occurred. . On June 1, 1900, the gauge at Tuscaloosa showed 4 feet above low water, but 38 feet above low water on June 9, while on June 15 the gauge read 15 feet. On June 25 the gauge disclosed 58 feet above low water. The result of this rise was to flood two of the lock pits from June 6 to July 14,1900, about which time the exhibit of the gauge showed 12 feet above low water. July 3, 1900, both resident engineer and the chief engineer officer refused on the application of the plaintiffs to authorize excavation work for the abutments during the season of 1900, assigning as a reason that the abutment walls could not be built sufficiently high during that season to protect the banks from *325 caving by the action of the winter and spring floods. Though plaintiffs protested against this decision the stakes were not set and excavation work for the abutments was not authorized until May 16, 1901, at two of the locks.
There was no such mistake in this decision of the engineer officers as to imply bad faith. By the contract the parties had agreed that the decision of the engineer officer in prescribing the order and manner of executing the work including excavations should be final.
But there was a lack of title where Lock 5 was situate so that authority to commence work on the abutment provided to be placed there was not granted until October 28, 1901, after several written requests on the part of plaintiffs to be permitted to begin work there had been refused.
Under the most liberal view the court has been able to take of the dispute between the parties respecting the beginning of the work we have not been able to find that the damage to plaintiff exceeded the sum of $9,891.57.
The third finding raises a question as to the right of plaintiffs to recover from the United States $4,946.58 for moneys expended for the repair and construction of roads and bridges.
On the first hearing judgment was rendered for the above amount with the announcement from the bench by this writer that he doubted the liability of the Government but would consider the item on the rehearing.
The roads referred to in paragraph 40 of the specifications were not public roads but plantation wagon roads over private property. But these roads had been previously used by surveying parties without objection from the owners. After plaintiffs had entered into the contract they found it necessary to purchase the right of way over the lands from the stations to the sites of the locks. One of .the owners of some of the land, where there was refusal to grant a right of way on any terms, refused the use of his road, thereby creating the necessity on the part of plaintiffs to obtain the right of way from another station on the railroad so as to give access to one of the locks. All the roads to the lock sites were constructed through heavy timber and swamps.
*326 The allegation in the petition “ that no wagon roads whatever existed ” can not be accepted as true.
The specifications described the sites as distant a certain number of “miles by wagon road.” Then there was a requirement that the contractors were to haul certain articles from railroad stations to the sites. (Pars. 40 and 41.)
Government officers knew nothing relating to the matter of private ownership of these plantation roads except as it is alleged and proven that the resident engineer stated to two of the plaintiffs that the roads to all three of the locks were open to the public and could be used by contractors. Defendants object to this statement of the resident engineer as incompetent because of the death of this engineer before he could be called as a witness and the interest of the parties in undertaking to testify to what this deceased agent of the Government had in his lifetime said to them about the roads.
By the law of Alabama (where this cause of action arose) the testimony of a party in interest is not admissible as to alleged statements of a deceased person. Defendants submit that this is peculiarly so while the deceased was acting as the agent of the United States (sec. 4007, Ala. Code). But we think the testimony is admissible for what it is worth, because by the act of March 3, 1887, 24 Stat. L., 505, commonly known as the Tucker Act, all claimants in this court were made competent witnesses in their own behalf without qualification. In Holds v. McLean,, 177 U. S., 579, it was held that where Congress had made no exception in qualifying parties as witnesses the court could make none.
While the letting plans exhibited to these contractors set forth clearly on which side of the river each lock was located' and did not show any public roads leading to the lock sites, the court is of opinion that in view of all the testimony, including that statment in the specifications describing the sites as distant a certain number of miles by “ wagon road,” that the contractors should be reimbursed for the amount they had to pay to private owners for the use of these roads. The amount which plaintiffs had to pay for obtaining a road on account of the refusal of one of the owners to permit the use of the owner’s private road was $100.
*327 . But manifestly the Government can not be made to bear any part of the expense incurred by plaintiffs incident to the repair of these wagon roads (or, for that matter, any roads, afterwards used), except as to that road which they had to obtain elsewhere after the refusal of one of the owners of a plantation road to permit the use of the particular. road so owned by him. The evidence does not establish that for this road any sum ivas paid. One of the roads leading down to the lock sites was traveled over by two of these contractors while preparing their bid on the work and the resident engineer offered to take them over the roads to the other locks. They had knowledge of the condition of these roads and the means of access to those points where they were to do the work. Independent of that they' were told by the advertisement that they were expected to visit the premises and to make their own estimates of the facilities and difficulties attending the execution of the work, including the uncertainty of weather “ and other contingencies.”
Around the fourth finding', which involves an alleged expense for additional excavation, there is controversy. Plaintiffs say that the boring sheets shown to bidders contained no record of any impenetrable material and that when the boring sheets came to be inspected by the contractors in preparation for bidding for the work they found no record of sunken logs or of cemented sand'and gravel or conglomerate impenetrable by the drill such as would have altered materially the prospective difficulty and cost of doing the work.
Paragraph 48 of the specifications provided that—
“ The material to be excavated, as far as known, is shown by borings, drawings of which may be seen at this office, but ■ bidders must inform and satisfy themselves as to the nature of the material.”
The borings and drawings referred to in the specifications were made by a field party the year before the contract was let for the distinct and primary purpose of ascertaining the availability of sites for the locks and dams proposed to be constructed and to determine what kind of a foundation would be necessary. These borings were made with reference to whether the sites to be selected were underlaid with' *328 rock or other suitable strata upon which the structures could be built or whether it would be necessary to drive piles in order to secure solid foundations. The borings were made with a water jet forced down through 1-inch pipe so joined together as to constantly bring up samples of the materials penetrated.
The record of the different material and the thickness and depth at which this material was found was kept in different books by each foreman with instructions to make full and complete notes. The engineer in local charge calculated very soon after each day’s work from the notes so taken the correct elevations of the various strata with reference to datum upon which all surveys of the whole work of improvement, including drawings and plans for the contract, were based, End the figures were copied into two other books from which the drawings named in paragraph 48 were afterwards plotted. Sometimes obstructions would be met when the drill was driven down into the ground. These obstructions, though in some instances noted in the original notebooks of the foremen, were not transferred to the drawings and do not. appear thereon. As obstructions were met the apparatus was moved elsewhere until a place was found where the drill would penetrate. The boring sheets referred to in the specification contained only the record of completed borings and did not show any record of sunken logs or of cemented sand and gravel or conglomerate impenetrable by the drill. There were 16 entries recorded in the notebooks relating to borings for foundations under structures. The borings were never completed. The foremen’s records contained no positive infomation that a sunken log was struck and at only three of the borings at two of the locks is there probable indication that logs may have been encountered.
As the entire purpose was to determine whether it would be necessary to drive piles to secure stable foundations, the resident engineer did not consider the indication of logs of enough importance to be noted and the same were not noted. The contract specifications provided for piles to be driven.
Neither the engineer officer nor resident engineer had any knowledge that any uncompleted borings had been taken *329 or that any borings bad been taken at a point other than that indicated on the drawings. The engineer officer who, on the part of the United States, made the contract with the plaintiffs had no knowledge of the opinion of the resident engineer regarding the' unimportance of noting anything indicating the presence of logs.
The finding also shows that for 20 years prior to the making of the contract the Government had operated snag boats on this river for the removal of stumps and sunken logs, trees, and other material from the channel and that the numbers of logs, trees, and stumps were noted and statements of cost of this work were published annually by authority of law.
If on the finding there is liability on the part of the defendants to the contractors the judgment should be $6,150.
In considering liability on this item we must eliminate' fraud such as would form the basis of an action for deceit. In Farrar v. Churchill, 135 U. S., 165, it was said that where a purchaser investigates for himself and nothing is done to prevent his investigation from being as full as he chooses he can not say that he relied on the vendor’s representations.
Expressions of opinion, judgment, or belief, if honestly entertained, are not representations of fact, and although subsequently shown to be erroneous or even false, do not amount to fraud and can not be treated as such either for the purpose of maintaining actions for deceit or actions growing out of contracts at law or in equity.
The primary object of the borings not being to explore for the benefit of future unknown bidders, and the exact character of the material thereafter to be excavated from the bed of the river having been made solely for the purpose of enabling the engineer officers to determine the character of foundations advisable to adopt, the court is unable to award judgment for plaintiffs for any amount on this item for more particular reasons now to be stated.
There were 16 entries in the foremen’s notes relating to borings for foundations not copied in the permanent field books. There is not one entry which contains positive in *330 formation that a single log was struck in making the borings. Of the whole number of the foremen’s uncopied entries only three afford probable indication that logs might be encountered.
Embedded logs in a river like that which the contractors undertook to improve are of frequent occurrence. That they should be looked for even though the boring sheets might fail to disclose them goes without saying. Especially is this true in view of the statement that bidders were required to “inform and satisfy themselves as to the nature of the material” in the bed of the river. Official reports duly published by authority of law disclosed that preceding June 30, 1897, there had been removed from the bed of the stream below Tuscaloosa over 20,000 snags and stumps; 500 sunken logs; logs on banks cut up, 1,339; trees trimmed, deadened, felled, and cut up, 18,168; and “slip-ins ” removed, 908.
Paragraph 47 of the specifications provided that the contractors should remove all logs, stumps, and roots under water dr embedded in the bank. Paragraph 48 provided for the excavation of all dredged or excavated materials of whatever nature, and there appears a provision that the material to be excavated, as far as hnown, was shown by borings, drawings of which might he seen at the office of the engineer. The evidence does not establish, to the satisfaction of the court, that the statement made by the resident engineer to the local engineer in charge with respect to the unimportance of noting the presence of the few logs discovered the year preceding was other than an honest expression of the resident engineer’s opinion as to the necessity for it, nor that said statement was made for the purpose of inducing the engineer in local charge or any other employee of the Government to omit from the record of the borings the notes indicating the presence of logs at the two locks, nor for the purpose of concealing the existence of hard substances beneath the surface of the river, or in any way misleading subsequent bidders. This part of the fourth finding is objected to by the contractors for the apparent purpose of having the court draw a conclusion of fraud with an intent to *331 deceive future bidders, or for the appellate court itself (on the single statement) to reach a conclusion that there was an intention to deceive and that such statement actually did deceive.
Considering the circumstances and time of this statement of the resident engineer, the court is of opinion that the Government is entitled to the finding as made, just as much as the contractors themselves would be entitled to a finding of mistake so great as to imply bad faith on the isolated testimony of any other agent of the Government where bad faith could more clearly be implied.
But we must look to the circumstances and all the evidence to determine whether this direction as to the unimportance of noting anything to indicate the presence of logs was the result of “ fraud or of such gross mistake as would imply a fraud ” under the rule declared in Martinsburg v. March, 114 U. S., 549; United States v. Mueller, 133 ib., 153; Ripley's case, 223 ib., 701.
Bidding on the work at the time the statement was made was not under consideration. The boring parties had in view when they made their soundings nothing but the ascertainment of suitable foundations for determining whether the locks could be built at that point.
This part of the finding arises out of the evidence from the whole record, and it is doubtful in the minds of some members of the court whether, as to the single fact, it is necessary to state this opinion of the subordinate agent of the Government under the terms set forth in the case of Southern Development Co. v. Silva, 125 U. S., 247. It can not be said that this opinion was made in order to have it acted on by future bidders. Nor can if be said that it was so acted upon by these contractors to their damage and in ignorance of its falsity. As against the matter of any design to mislead bidders, all of them had access to everything in the office of the resident engineer, including the notes relating to the borings pertaining to the character of the material in the river. There is no pretense whatsoever that any information which the records of the office of the resident engineer contained was withheld from anybody. The contract contained an *332 express stipulation warning these contractors not to rely upon the boring sheets.
The circumstances show three things: (1) that the resident engineer had no intention to deceive anybody; (2) even if he had, the specifications put the contractors upon their guard; and (3) in view of their admission the contractors were not deceived at all, inasmuch as they say they had expected to find obstacles and obstructions beneath the surface of the river not noted in the record.
In plain view were snags, stumps, and indications of embedded logs at the very point where these locks were to be constructed.
Nothing whatever appears to have been done to prevent the investigation of the contractors from being as full as they chose to make it. Under such circumstances contractors can not afterwards allege that the Government’s resident engineer made representations respecting the subject investigated which were false.
The case of Lehigh Zinc & Iron Co., 150 U. S., 673, is without application because of the two notices to the contractors (1) that the office of the resident engineer was ready to supply all information which the office possessed and upon which the plans were drawn, and (2) because the notice to them to satisfy themselves of the material to be excavated qualified the obligation of the defendants to be literally bound by what the boring sheets did show. Notices like these mean something and especially do notices to contractors to satisfy themselves become conclusive unless we deny to defendants the right to make such a contract.
The inducement disclosed by the finding is insufficient to relieve plaintiffs from investigating for themselves. Nor do the findings show that plaintiffs did not have adequate time to investigate or that the engineer officers knew that plaintiffs did not investigate.
In the case of Clapham v. Shillito, 7 Bevan’s Rep., 149, Lord Langdale stated the English rule that has generally been followed in this country as follows:
“ If the means of investigation and verification be at hand, and the attention of the party receiving the representation *333 be drawn to them, the circumstances of the case may be such as to make it incumbent on a court of justice to impute to him a knowledge of the result, which, upon due inquiry, he ought to have obtained, and thus the notion of reliance on the representations made to him may be excluded.”
This finding must be taken from another point of view. If the contractors can now hold the Government liable we must also decide that the contractors would have had the right to rescind the contract as the work progressed. All the authorities sustain this view. “ It must be established by clear and decisive proof that the alleged representation was made in regard to a material fact; that it was false; that the maker knew it was not true; that he made it in order to have it acted on by the other party; and that it was so acted upon by the other party to his damage and in ignorance of its falsity and with a reasonable belief that it was true.” Southern Development Co. v. Silva, supra.
The right to rescind was never claimed. The right to be reimbursed for damages was never preferred. The contractors made no such protest as under the contract they had a right to make if they were misled. They never said that there was imposition such as would sustain an action for deceit after the work had begun. At a time when they could have complained and when the testimony of the resident engineer could have been taken these contractors were silent. This subordinate agent in the meantime died, and we deem it but just to the defendants that the finding should be made not merely for the right of the Government, but likewise because it is the due of the deceased resident engineer.
The purpose of the specifications warning bidders to inform and satisfy themselves as to the nature of the material was to protect defendants against the mistakes or errors of subordinate agents' which the Government is compelled to employ in the execution of works of this kind.
As to the cemented sand and gravel and conglomerate, plaintiffs necessarily knew that the improvements they were to construct were to rest either upon such solid foundation as would make the improvements stable or upon piles to be driven into the bed of the river for the same purpose. They *334 knew that all material beneath the surface of the stream had to be excavated until a solid foundation was attained to be judged of by the chief engineer.
Defendants, as in Simpson v. United, States, 172 U. S., 372, made the contract without any stipulation that the ground selected should be of defined character. When we admit that there was anything equivalent to a warranty of any kind as to what was or was not in the bed of the river upon which plaintiffs had a right to rely this court in effect reverses the proposition announced in Simpson's case (supra), which, of course, this court can not do.
The contract contained no statement or agreement or even intimation that any warranty, express or implied, in favor of the contractors was entered into by the United States concerning the character of the soil in the bed of the river by the warning ubi/t bidders must inform themselves as to the nature of the material ” without relying on the drawings. In stipulating for sheet piling and the methods to be adopted for making the driving of sheet piles necessary to serve the object in view the contractors could not have relied upon anything in the nature 'of a warranty respecting the material to be encountered in the progress of that part of the work.
The case of Pearson v. Dublin Corporation, 1907 App. Cases, 351, is inapplicable because the questions presented in the case arose out of an action of deceit for damages for alleged fraudulent representations. The House of Lords remanded that case for a new trial entirely ripon the question of law arising from the construction of the specifications by the trial judge. It seems that by the terms of a paragraph of the contract in that case the question arose whether the corporation could relieve itself from the consequences of a false and fraudulent representation intentionally inserted by the agents of the corporation in the plans and specifications. The evidence in the present case is entirely different. There was no intention to deceive; and, as a matter of fact, it is impossible for us to believe that these contractors were deceived, because of the' admission made by them that they expected to encounter obstructions below the surface of the water.
*335 In the case of Sanitary District of Chicago v. Richer, 91 Fed. Rep., 833) the circuit court of appeals in reversing the court below declared that a contractor for the excavation of a section of a drainage canal was not entitled to a rescission of his contract because he encountered a substance more difficult and expensive to excavate than anything he was led to expect from examination of the profile and data in the office of the chief engineer — no intentional fraud being charged— nor because some of the trustees knew, or should have known, of the existence of further information on the subject of which they did not inform the contractor. The court further held that the chief engineer whose duty it was to let contracts for work could not by representations made to an intending bidder as to the nature of materials to be excavated bind the Sanitary District, much less by expressions of opinion thereon. Our conclusion relating to the fourth finding is that the contractors took chances in making their bid as to the extent of the obstructions encountered, and that the increased expenditure was the result either of miscalculation at the outset on their part; or, an afterthought arising during the progress of the work from the floods which naturally, precipitated around the locks and dams more material for excavation than they would have encountered but for the extraordinary rises in the river.
The fifth finding relates to a matter of engineering by way of preparation for the work' of the contractors. Plaintiffs claim an excess of excavation work, due to en erroneous angle of repose, and the amount demanded is $57,162.41.
Paragraph 48 of the specifications provides that—
“All dredged or excavated materials of whatever nature will be classified as ‘ excavation.’ All excavations shall conform to such lines, slopes, and grades as may be given by the engineer officer, and anything taken out beyond such limits will not be paid for by the United States. The price for excavation shall include the moving of the material to its place of deposit.
$ * * * *
“ The limits of the excavation and quantities to be exea- * vated will depend upon the ascertained angles of repose.”
*336 Plaintiffs contend that this clause constituted an agreement that all banks should be sloped to those angles of repose which they say in engineering practice means an angle at which the material in an excavated bank will stand firm under any and all conditions of freshets or floods, whether under abnormal conditions or otherwise, until the work is completed. Defendants, on the other hand, insist (and the engineer officers so decided) that the term as used in the specifications, and also in engineering practice, did not mean permanent stability under extreme conditions for the slopes of temporary excavations, but merely such angles as to afford stability for sufficient time to enable the work to be done under normal conditions. Much testimony, expert and otherwise, was taken to show the meaning of the term “ angle of repose ” for excavated banks.
The angle prescribed by the engineer for the slope of all work of a temporary character was an angle of 1 on 1, or 45°. It was such an angle as the banks would stand for the time necessary to complete the work when not submerged from rises in the river or when in a dry condition. During every working season, however, with few exceptions, at least-one rise in the river occurs which so affects the stability of the slope as to cause the bank to slough, and during every year there are liable to be more frequent rises than one.
The angle adopted by the engineer officer was the result of his previous experience on this river and because it was the angle in general use on the Mississippi River for the slopes of temporary excavations.
But the conditions actually encountered during the working seasons of 1900 and 1901 were abnormal. During each of these seasons the work under this contract was hindered by a series of floods, freshets, and unexpected rises of the river “ more numerous and of greater height and of longer duration than theretofore disclosed by the published official records of the engineer’s office relating to the river.”
Had the banks been sloped to a flatter angle the sloughing would have been reduced, but the finding does not show to what extent. To attempt to do so would be a matter of conjecture, as the floods caused deposits from above of silt, sand, *337 and sediment around the locks and brought leaves, trash, and earth from the lands and fields adjacent to the lock sites and into the river.
The slopes of the excavation were not better flattened by the engineer officers, because in their judgment there was no practical angle at which the banks could have been sloped which would have caused them to remain stable under the conditions to which they were liable to be subjected. The finding shows that nothing could have prevented the banks from caving as the floods subsided and water (from the rises in the river) receded.
There was no angle of slope which could have been adopted by which the banks would remain stable when subjected to such rises in the river as were liable to happen in times of flood. If the slope for the temporary work had been flattened to 1 on 3 the quantity of excavation would have been increased beyond the quantity estimated in the specifications.
But plaintiffs contend that a single fixed angle of 1 on 1 was arbitrary. They insist that as a term of civil engineering the court should be governed by the dictionary definition, as follows: “ The maximum angle with the horizontal at which a mass of material, as in a cut or embankment, will lie without sliding.” Numerous authorities have been presented to show that none of the definitions expressly or impliedly qualify the definition stated by any reference to conditions characterized as normal.
On the other hand, the contention of the defendant is that frequent rises in a river are to be regarded as weather conditions, which in all cases go to determine the angle of repose for the slope of the bank.
The only authority of any bearing for plaintiffs, outside of the dictionaiy definitions, is that of Gleason v. Virginia Midland Railroad Co., 140 U. S., 435, where it was held that a railroad was responsible for an accident to a train caused by a landslide produced by the giving way of the banks of a cut. The cut was at an angle so steep the earth would slide. There it appeared that a landslide in a railway cut caused by an ordinary fall of rain was not an act *338 of God sufficient to exempt the railway from liability to passengers for injuries caused thereby while passengers were being carried on the road; that it was the duty of the company so to construct the banks of its cuts that earth will not slide by reason of the action of ordinary natural causes and by inspection and care to see that they are kept in such condition. . Failure so to do presented a case of negligence.
' The court held that to all intents and purposes a railroad track which runs through a cut where the banks are so near and so steep that the usual laws of gravity would bring upon the track débris created by the common processes of nature was negligence if ordinary skill would enable engineers to foresee the result and allow the company to guard against it.
•The case here is entirely different. The letting plans did not show the slopes of the excavation. But the original cross-section sheets, from which the estimated quantities of excavation in the specifications had been calculated, show in pencil the different angles of all slopes at 1 on 1 behind structures for temporary work and a flatter slope of 1 on 14 to 1 on 2 during the period of the contract for all permanent work. Both angles of repose were constructed accordingly. These cross-section sheets, although not made part of the letting plans, were on file in the office of the resident engineer and were open to examination by bidders prior to submitting proposals and were, in fact, examined by at least one of the prospective bidders. There was no concealment and plaintiffs do not say there was.
Plaintiffs made no attempt to verify or estimate for themselves prior to the acceptance of their bid the approximate quantities of excavation submitted, nor did they make any inquiry concerning the method by which said approximation had been reached.
The right to recover is based entirely upon the conflict between the parties as to the general meaning of the phrase “ascertained angles of repose.”
The specifications provided:
. “ 89. These specifications are intended to be full, clear, and complete; any doubt as to their meaning or any obscurity in wording of them will be explained by the engi *339 neer officer, who shall also have the right to correct any errors or omissions in them whenever such errors or omissions become apparent.”
Paragaph 78 declares:
“ In all cases of dispute the decision of the United States engineer officer in charge will be accepted as final without appeal.”
. Can plaintiffs now claim anything unless there be fraud or errors so gross as to imply bad faith ? We think not, and as neither fraud, actual or constructive, nor error so gross as to imply bad faith is charged or proven against either Col. Kossell or Col. Spencer Cosby, who at different times had charge of the work and the right to decide differences relat-' ing to the meaning of the contract subject to appeal, there is no right to recover on this item.
And here it should be stated, in view of the charge of incompetence and unreasonableness, that there is nothing in the conduct of either one of the chief engineer officers or of the resident engineer or other agent of the Government to reflect upon their capacity, reasonableness, or good faith from the beginning to the end.
There is presented by the sixth finding an item of $1,183.41 for the alleged increased time taken in driving the round piles called for by the contract by reason of the greater difficulty of penetrating occasional obstructions encountered.
The finding shows a sandy soil underlain by thick and heavy beds of gravel; very hard sand, white, red, and blue' in color; gravel, sand, and blue clay; and closely packed sand and coarse gravel, sandstone, and rock. Some of the' sheet piles could not be driven to the desired penetration on account of buried logs. But there was much sickness among the pile-driving crews, and during the first season plaintiffs drove both classes of piles without .the use of a water jet, but afterwards when jets were used there were times when the pressure of the jets was not strong enough to properly carry on the work. The most serious difficulty was caused by material classified on the boring sheet as hard clay and shown to be underlaid by hard white sand, soft sandstone, and white, and blue clay, and it was found impos *340 sible to penetrate this material. The pile driving was directed by experienced Government engineers and the inspection was made in- accordance with the specifications. Plaintiffs made no written protest that the requirements of the inspectors were unreasonable or that they exceeded the specifications in any particular.
The findings do not show cemented sand and gravel or conglomerate sandstone. There was sand and gravel, otherwise known as conglomerate material, but defendants did not warrant the nature of the material to be excavated, but having warned intending bidders to investigate and satisfy themselves and it being established that no agent of the Government had any knowledge as to the existence of conglomerate in the foundation material under any of the structures, the court is unable to make an allowance on this item.
The failure of the foremen’s notes to show conglomerate and its consequent omission from the boring sheets resulted from the fact, in all probability, that the borings were not in continuous lines, as were the sheet piles, but said borings were at intervals of from 50 to 68 feet apart and nearly in the center or halfway between the continuous water-tight lines of the sheet piles subsequently driven. The borings were made by a water jet forced down through a 1-inch pipe inside an outer casing of a 2-inch pipe. The 1-inch pipe was raised and lowered by hand inside the casing and the samples were washed up through the two pipes and out through a spout above ground where they were examined. Thus all specimens of material necessarily had to be first so crushed or reduced as to permit them to be washed up in the annular space between the two pipes, and when the drill pipe was in the center of the casing the space was reduced to one-quarter of an inch, less the projection of the sleeve or coupling by which the lengths of the drill pipes were joined together. It seems reasonable to say that the specimens raised by the jet did not indicate its true character to the foremen, whose omission to enter it as conglomei’afce in the field notes was an honest mistake of judgment.
The finding shows that the specimens raised by the jet would not have given any different indication from hard and *341 closely packed sand and gravel; that it was impossible to determine by certain borings whether the material was gravel or hardpan.
Paragraph 52 provided that bills and lengths for all piles were to be furnished by the engineer officer, but the contractors were required to furnish and drive, at their own expense, test piles wherever required. Sheet piling was to be jetted into place between temporary walling pieces and settled after jetting with a suitable hammer. The Government stipulated for penetration of at least 10 feet below the bottom of walls and for care as to how the foundation and heart piles should be protected in driving with a 3,000-pound hammer operated by friction or with a 3,500-pound steam hammer.
The court finds that there were at all times during construction at each lock site at least two competent and experienced junior engineers or inspectors well qualified for local charge of the work. These men were usually assisted at each lock site by three or four inspectors and recorders, who generally were men of considerable practical experience or were graduates of engineering schools. Some inexperienced recorders were used to assist in the work, but were not placed in responsible positions until they had acquired some experience and then only under close supervision of competent and experienced superiors.
By the specifications it appears that the sheet piles were to be driven in continuous rows to a depth of at least 10 feet below the bottom of the walls of all structures, but in all cases to the satisfaction of the engineer officer. They were intended to form a screen completely surrounding and protecting all foundations from injury or impairment by undermining or seepage from the river. The stability and integrity of all the structures directly depended upon the officer whom plaintiff had agreed to have the right to be satisfied with their work.
The three different alternative methods by either or all of which the piles were provided to be driven were apparently provided, for the reason that the material shown on the boring sheets was of such varied character as to make it doubtful whether piles could be jetted into that material at *342 all. The boring sheets indicated that in some places the driving would be easy, but that it would not be easy in the gravel and hard gravel shown in the borings.
The findings also show that: (1) None of the pile-driving force of the contractors had ever before attempted to drive continuous lines of water-tight sheet piles; (2) that there was a good deal of sickness among the pile-driving crews and consequent- difficulties; (3) both classes of piles during the first season were driven through the heavy beds of gravel without the use of a water jet; (4).there were times when the pressure of the jets in actual use was not as strong as it should have been to properly carry on the work; (5) the dimensions and material of the sheet piles were such that they could not be given as long,, and consequently as hard, a blow as the foundation piles; (6) there was, however, some difficulty occasioned by sunken logs, but these were sometimes partially above and at other times wholly below the level of the excavation and along with other obstructions made the driving somewhat more expensive and difficult enough to result in delays; (7) the greatest difficulty in the .matter of pile driving was occasioned by the material found to extend over and above two-thirds of the area of the abutment of Lock 5 and running out for about 40 or 50 feet from the bank under the dam. This material appears on the boring sheet as “hard clay,” and is shown to be underlaid by “ hard white sand,” “ very hard white sand,” “ soft sandstone,” “ white and blue clay,” and “ clay.”
There is no finding that any of this material was really soapstone, and the effort to connect the failure to- classify soapstone on the boring sheet as a part of willful and deliberate misrepresentation seems to have been abandoned, since the requests for findings contain no reference to soapstone.
It is shown that the engineer officer never refused to modify the requirements of the inspectors in charge of pile driving on any part of the work; that the engineer officer witnessed the driving of a pile which was driven ■ too hard, badly bruised and split, and that orders were given to the inspectors not to allow such hard driving. This was done as a matter of protection to the work.
*343 It is also shown that the contractors were notified frequently that if they were not perfectly satisfied with the way in which pile-driving work was being carried on or with the decisions of the inspectors they could immediately bring the matter to the attention of the engineer officer in charge, with the statement that any complaints would have immediate attention. It is also shown that the engineer officer had occasion to remonstrate with the contractors again and again because they did not comply with that request or would constantly refer to some subject of complaint never before brought to the attention of the engineer officer.
In making the closures in the dam at one of the locks the current had scoured the bed of the river out to a depth of 20 feet. The penetration of the sheet piling at that point was 22 feet in what appeared to be tough clay. The head of water when the closure was made was only 2 feet; and after that dam was completed the material below had scoured out in places to a depth of 27 feet, or considerably below in places, the bottom of the sheet piles in the adjacent structures. Such structures have only been saved by the use of considerable rock and stone dumped along the face of the lock wall and the abutment face below the dam. The same thing occurred under an 18-inch head of water when the closing piles for the upper row in the dam at another lock were being driven. The round piles there supporting the pile driver gave way.
While plaintiffs complained of the difficulty of their work* they never at any time made written protest that the requirements of the inspectors were unreasonable or that the specifications under which they were working were exceeded in any particular.
Under the seventh finding there is a demand for an item of $2,871.63 on account of piles billed too long. Plaintiffs say that the engineer officer ordered them of excessive length.
But on January 26, 1901, a complete bill of piles was furnished to contractors.
The lengths shown on this bill were satisfactory to the contractors and were necessary for the work, in the judgment of the engineer officer. No protest or complaint as to the *344 lengths was thereafter made by the contractors, nor were the engineer officers or any of them requested to alter the lengths as specified.
The jigbtlH§ndi»g relates to a claim for $8,520.22 on account of the construction of cofferdams to protect the work against a rise of more than 8 feet. Plaintiffs do not claim that this part of their demand is within the contract, but that they are entitled to recover therefor on quantum meruit.
Paragraphs 45 and 46 provide:
“45. Oo-fferdams. — All pumping, bailing, and temporary works needed to. protect the permanent work from water during construction shall be done by the contractor at his own expense, the cost of same to be included in his prices for concrete, timber, etc. It is probable that the sheet piling entering into permanent construction can, with proper banking and shoring, be made to serve the purpose of cofferdams, but the contractor must rely upon his own judgment in regard to this. Should additional cofferdams be needed they shall be built on plans approved by the engineer officer, and. where liable to interfere, directly or indirectly, with navigation, shall be removed when no longer needed, the building, maintaining, and removal of same to loe without cost to the United States-.
“46. Dams. — It is probable that the dams can be built without cofferdamming, but the contractor must rely upon his own judgment in regard to this, and should cofferdams prove necessary, it is understood and agreed that they shall be furnished by the contractor without cost to the United States. The method of construction suggested is first to dredge the site of dam to a level about 6 inches below the pile heads, then drive the three rows of sheet piling continuously from one end, cutting them off a sufficient distance below low water to permit the low-water flow of the river to pass over them without much head; then drive the foundation piles and cut them off at grade; then build the cribwork, one course at a time, filled and sheathed, protecting the work where necessary by temporary flashboards from the water, which will continuously flow over the work in a thick sheet. The dam shall be filled with gravel or stone, or both, at the option of the engineer officer.”
The specifications are explicit in the requirement that the contractors should furnish all cofferdams needed for the protection of the permanent work without cost. This part of the claim must fail unless in the requirements of the engi *345 neer officer in this regard there appears fraud or mistake so gross as to imply bad faith.
The resident engineer who is charged with intentional misrepresentation was dead before his proof could ever be taken. The charge against him is that he exhibited to two of plaintiffs upon the occasion of their preliminary visit to his office in Tuscaloosa hydrographs of gauge readings of the river taken at Tuscaloosa, and represented to them that these hydrographs showed the exact conditions of the river at the lock sites 46, 63, and 79 miles, respectively, below, whereas, in fact, there were in existence at that time readings from other gauges located at points in closer proximity to the lock sites which showed higher readings and longer duration of floods — conditions less favorable' to the construction of the work than those indicated by the Tuscaloosa gauge. It is charged that this fact was well known by the resident engineer but concealed from the contractors, which caused them to omit from their estimates the cost of expensive cofferdams which otherwise would have been included.
The two contractors mentioned who were present and took part in the same conversation with the resident engineer contradict each other. We find no fraud, actual or constructive, and no such gross mistake in his conduct or by anything he is alleged to have said as to imply bad faith.
That the work might be continued at the end of the first season the engineer officer decided to direct the contractors to finish the cofferdams consisting of mounds of earth then standing at approximately 9 feet above low water to a height of 10 feet at their expense and to cap the same with a cofferdam built of sheet piling to a height of 20 feet above low water, the last to be paid for under paragraph 88 of the specifications at three-fourths of the contract price for sheet piling, to which the contractors agreed. The contractors had notice, on November 17, 1900, that the only reason for building the cofferdams at the time was to have the permanent work continued during the winter. The contractors were directed to complete them at the earliest day possible, so to increase their force as to build them without retarding the permanent work, and for the same reason the excavations *346 from the lock pits were required to be diverted from the mounds to cofferdams. They were told that before beginning work on the cofferdams-to give a written statement as to- building the cofferdams without in any way retarding the permanent work with a proposal to press the permanent work through the coming winter as the stage of river permitted. Three days after receipt of the order, and before the-work of constructing the cofferdams could be commenced, the river rose to and remained at such a height it was not possible to build cofferdams during that winter.
- On May 4, 1901, the resident engineer informed contractors that there was an unwillingness to pay for any cofferr dam structures in addition to those authorized November 17, 1900; and also that there was doubt as to authority on the ¡part of the writer of the notice (the resident engineer) to pay for putting in the structures previously authorized as the emergency for which they were intended to provide had passed. That is to say, that there could be no prosecution of construction during the winter. Plaintiffs protested, and on May 9, 1901, the engineer officer referred the whole question direct to the Chief of Engineers for decision, who, after se.curing the views of Col. Haines, the division engineer officer, submitted the matter to the Secretary of War. The question in turn was decided by the Judge Advocate General of the Army as to whether the proposed sheet-pile topping could be paid for under a modification of the original project by a supplemental agreement or whether the work should be performed by the contractors at their own expense under paragraph 45 of the specifications. The opinion was given that .there was no legal authority to modify the contract so as to provide that the contractors should be paid for this work; and that when the principal engineer officer in charge on the spot, designed the work and prepared the specifications or what he gave the bidders to understand in the matter of the preparations of foundations being done at low water could not be .admitted to vary the plain terms of the written contract.
The Secretary of War approved the views of the Judge Advocate General and the contractors were notified.
*347 By paragraph 45 all temporary works needed to protect the permanent work from water, during work, was provided to be done by the contractors at their expense, the cost of which was to be included in prices for concrete and timber. The same paragraph provided for additional cofferdams, if needed, to be built on plans approved by the engineer officer — subject, of course, to the terms of the contract.
Plaintiffs have undertaken to give the engineer officer’s idea as to what prospective bidders were given to understand. But the finding shows that the. information obtained by prospective bidders was given, not by him, but from information received in the Tuscaloosa office of the resident engineer.
The fraud charge against the resident engineer is that he did not furnish any other or additional information to the two plaintiffs who went to his office, as to river stages at the lock sites other than that shown by the gauge at Tuscaloosa.
The court is of opinion that the alleged oral representation is inadmissible, not only because it is in direct contradiction to those provisions of paragraphs 45 and 46, but also because the testimony on this point as to what the resident engineer is alleged to have said is not sufficiently proven to be made a part of the findings of the court.
It is specifically stated in paragraph 46 that while it was probable that the dams could be built without cofferdams and that the contractors must rely upon their own judgment in regard to this, nevertheless, “ should cofferdams prove necessary, it is understood and agreed that they shall be furnished by the contractor without cost to the United States.”
The hydrograph establishes the finding that the readings at Tuscaloosa are higher in'each instance than at either of the interpolated gauges located at the lock sites.
The Tuscaloosa gauge was located 9 miles below Lock 4, Black Warrior Biver. There is scarcely any fall or drop in the Warrior for 24 miles below Tuscaloosa and about 60-foot fall in the next 106 miles to Dejnopolis. Inasmuch as the complete surveys of the river had been made from Demopolis up to Tuscaloosa, the contractors could easily have ascertained before bidding just what the gauge was between the two points. . . ..
*348 It is contended that paragraph 88 of the specifications conferred full power on the engineer officer to pay for the cost of the cofferdams. That paragraph relates to purchases made or work done not specified, and reads as follows:
“ If at any time it should become necessary, in the opinion of the engineer officer in charge, to do any work or to make any purchases not herein specified, for the proper completion of this work, the contractor will be required to'furnish the same at the current rates existing at the time of said purchase or work. The current rates to be determined by the engineer officer in charge.”
This paragraph can not be invoked to sustain’the item in dispute, because paragraph 88 is limited to work or purchases not specified in the contract. But cofferdams were expressly specified to be furnished by the contractor without cost should their construction prove necessary. When the engineer officer determined that these were necessary for the protection of the work the terms of the contract were fully met.
The total cost of all cofferdams (excluding those constructed for the purpose of building the dams) was $11,456.91. An allowance of $2,000 apiece was made in the proposal for cofferdams for each lock, making $6,000' in all. This part of the finding being an admission of one of the plaintiffs, the claim for more money under this item is inconsistent with the admission.
It is possible that the dispute about this item grew out of a mistake on the part of the plaintiffs in their estimate as to the cost of the cofferdams.
While the court has found that there was no fraud or deception practiced upon plaintiffs with respect to the necessity of cofferdams in the prosecution of the work, and while the court is of opinion that the amount claimed should not be allowed, because of the terms of the contract, the sum claimed should be reduced to $5,456.91 (if considered as a liability at all) because of a necessary deduction of $6,000 from $11,456.91.
In the case of Plumley v. United States, recently decided on appeal from this court to the Supreme Court, 226 U. S. R.., it was held that Plumiey could not recover for that which, *349 though extra, was not ordered by the engineer officer in the manner required by the contract. Here is a distinct affirmation of the meaning of section 3744, Bevised Statutes. Ripley v. United States, 223 U. S., 695; McMullan v. United States, 226 U. S.
By the ninth finding compensation is claimed for excavation through earth levees erected by the contractors for the protection of the lockwork which it was necessary to remove in order to construct foundations for the dams. Paragraph 45 required the contractors to remove the cofferdams when no longer needed and where liable to interfere, directly or indirectly, with navigation; their removal was to be without cost to the United States. The dams could not be constructed until the cofferdams were removed and the earth used therein excavated, and this excavation was to some extent an interference with navigation. Payment for this work, the cost of which was $913.29, was properly refused.
The tenth finding presents a claim of $9,754.55 growing out of tETsubstitution of stone filling for the dams in place of gravel filling and of riprap for the banks furnished at a loss, which the court finds amounted to $14,494.45.
In two of the paragraphs of the specifications we find a provision for a filling of “gravel or stone.” The direction for gravel filling seems to be final; but bids were called for to cover both, and the contract provided for gravel filling, per cubic yard, for Nos. 4, 5, and 6, 42 cents; following “ and for alternative matters, when used, as follows: Stone filling, per cubic yard, for Nos. 4, 5, and 6, $1.14.”
This gave the defendants the option of ordering stone in place of gravel, in whole or in part, for the filling for the dams.
After the contract was signed there were delivered to plaintiffs their working drawing plans, identical with those shown them when preparing to bid and were identical with those annexed to the contract. They arranged for procuring sand and gravel close to the scene of the work.
In October, 1900, plaintiffs were given notice to deliver stone for filling the dams to the quantity of 11,590 cubic yards. Some protests not to the substitution but to the *350 quantity called for followed, but there'was finally a decision by the engineer officer that the minimum amount of stone that could be accepted for the three locks was 12,000 cubic yards. The final estimate showed a total of 7,110 cubic yards. For all three locks there was a total of both stone filling and riprap of 13,967.99 cubic yards.
Plaintiffs gave notice that they did not “ take kindly to the idea of having changes from the original plans,” and asked for a decrease of the stone quantities. The engineer officer decided that 12,000 cubic yards was the minimum amount of stone that could be accepted under the contract. Revised plans for the dams were prepared by direction of the engineer officer, and on February 29,’ 1902, the engineer officer modified the requirements for the substitution of stone in whole for gravel filling in the dams and submitted an outline of the proposed changes. Plaintiffs notified the officer that the changes indicated were acceptable to them, and accordingly they were furnished revised plans for the dams and bank protection, which they also informed the officer were satisfactory to them. Thereafter a supplemental agreement was executed.
' Bock 5 was not navigable during the high water of the winter and spring of 1902-3. Had plaintiffs earlier completed the dam at Lock 6' which made necessary the turning of the river through the lock for the convenience of the contractors and to facilitate the construction of the dam there would have been no delay. Plaintiffs caused the delay of two weeks in the erection of the -gates at the upper lock. ' The court can not find that there was any fault on the part of the Government to provide gates, but, on the contrary, plaintiffs were directly responsible for the delay-. ■
If there was an increased expense to the contractors in procuring stone at a different quarry from that from which they first expected to obtain stone, the fault was with them. ■ The plan prepared at the outset for procuring sand and gravel would have been necessary in any event to supply materials for making the concrete of which the structures were built, whether the contractors had been specifically in1 •formed when the contract was signed or not that stone would *351 be required in accordance with their proposal and agree-*; ment.
PlaintiiEs made no protest in writing against or appeal _ from the engineer officer’s decision directing the use of stone for filling the dams or protecting the banks. '
■ Oh the whole case we find that plaintiffs are entitled to' judgment on the second finding amounting to $9,391.57; on the third finding, plaintiffs are entitled to judgment in the sum of $100. .
; As to the items setting forth demands in all of the other findings of the court, judgment will be entered for defends ants, and as to the amounts therein claimed the petition, is. dismissed. .¡i,
Judgment under the two findings above mentioned will-be entered for the sum of $9,491.57 in favor of plaintiffs against the United States.